Paul Kampmeier, WSBA #31560
Kampmeier & Knutsen, PLLC
811 First Avenue, Suite 468
Seattle, Washington 98104
Phone: (206) 858-6983
Email: paul@kampmeierknutsen.com

*Attorney for Plaintiffs Citizens for a Healthy Bay
and Puget Soundkeeper Alliance*

Katelyn Kinn, WSBA #42686
Puget Soundkeeper Alliance
130 Nickerson Street, Suite 107
Seattle, Washington 98109
Phone: (206) 297-7002
Email: katelyn@pugetsoundkeeper.org

*Attorney for Plaintiff Puget Soundkeeper Alliance*

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

|  |  |
|---|---|
| CITIZENS FOR A HEALTHY BAY, and PUGET SOUNDKEEPER ALLIANCE, )<br><br>Plaintiffs, )<br><br>v. )<br><br>ELECTRON HYDRO, LLC, )<br><br>Defendant. ) | Case No. 2:21-cv-319<br><br>COMPLAINT |

## I.     INTRODUCTION.

1.      Plaintiffs Citizens for a Healthy Bay ("CHB") and Puget Soundkeeper Alliance

("PSA") (collectively, "the Conservation Groups") bring this lawsuit under Section 505 of the

Clean Water Act, 33 U.S.C. § 1365. Defendant Electron Hydro, LLC ("Electron" or

"Defendant") owns and operates a hydroelectric dam on the Puyallup River in Washington State.

COMPLAINT - 1
W.D. Wash. Case No. 2:21-cv-319

Kampmeier & Knutsen PLLC
811 First Avenue, Suite 468
Seattle, Washington 98104
(206) 858-6983

The Conservation Groups allege Electron is in ongoing violation of the Clean Water Act because it is conducting activities and discharging pollutants and dredged or fill material to waters of the United States in violation of the terms and conditions of a certification made under Section 401 of the Clean Water Ac, 33 U.S.C. § 1341 ("401 Certification"), and because it violating Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a), by discharging heat, other pollutants, and dredged or fill material to the Puyallup River without authorization of the required permits. The Conservation Groups seek declaratory and injunctive relief, the imposition of civil penalties, and an award of costs, including attorneys' and expert witness fees, for Electron's repeated and ongoing violations of the Clean Water Act ("CWA" or "Act").

## II.    JURISDICTION AND VENUE.

2.      This Court has jurisdiction pursuant to 33 U.S.C. § 1365 (CWA citizen suit provision) and 28 U.S.C. § 1331 (federal question). Defendant is in ongoing violation of an "effluent standard or limitation" as defined by Section 505 of the Act, 33 U.S.C. § 1365. The requested relief is proper under 28 U.S.C. §§ 2201 and 2202 and 33 U.S.C. § 1365.

3.      The Conservation Groups satisfied the jurisdictional requirements for bringing this lawsuit. Under Section 505(b)(1)(A) of the Act, 33 U.S.C. § 1365(b)(1)(A), by certified letter dated and postmarked October 28, 2020, the Conservation Groups notified Defendant and its registered agent of Defendant's alleged violations of the Act and of the Conservation Group's intent to sue for those violations ("Notice Letter"). The Conservation Groups also notified the Administrator of the U.S. Environmental Protection Agency ("EPA"), the Administrator of EPA Region 10, and the Director of the Washington State Department of Ecology ("Ecology") of its intent to sue Defendant by mailing a copy of the Notice Letter to those officials on October 28, 2020. A copy of the Notice Letter is attached to this complaint as Exhibit 1.

COMPLAINT - 2
W.D. Wash. Case No. 2:21-cv-319

Kampmeier & Knutsen PLLC
811 First Avenue, Suite 468
Seattle, Washington 98104
(206) 858-6983

4.      More than sixty days have passed since the Conservation Groups mailed the Notice Letter and the violations complained of are continuing or reasonably likely to continue to occur. Neither the EPA nor Ecology has commenced any action constituting diligent prosecution to redress the violations alleged herein. Defendant is in ongoing violation of the CWA.

5.      Venue is appropriate in this District under Section 505(c)(1) of the Act, 33 U.S.C. § 1365(c)(1), because the source of the violations complained of is located in this District, in Pierce County, Washington.

6.      A copy of this Complaint will be served on the Attorney General of the United States, the Administrator of the EPA, and the Administrator of EPA Region 10, as required by 33 U.S.C. § 1365(c)(3) and 40 C.F.R. § 135.4.

### III.      PARTIES.

7.      Citizens for a Healthy Bay has standing for the relief sought herein. CHB brings this complaint on behalf of itself and its member(s). CHB is a non-profit corporation organized under Section 501(c)(3) of the Internal Revenue Code and registered in the State of Washington. CHB's principal place of business is in Tacoma, Washington. CHB is dedicated to protecting and preserving the natural environmental in western Washington State, including protecting the Puyallup River, Puget Sound, their tributaries, and the aquatic species that use and rely on those waters for habitat and sustenance.

8.      CHB has representational standing to bring this action.  CHB is a membership organization with members who are injured by Electron's violations of the CWA. CHB has at least one member who lives, works, recreates, observes, or enjoys surface waters, fish, or wildlife, within the watersheds impacted by Electron's dam and activities, including the Puyallup River, Commencement Bay and South Puget Sound.  One or more of CHB's members are

COMPLAINT - 3
W.D. Wash. Case No. 2:21-cv-319

Kampmeier & Knutsen PLLC
811 First Avenue, Suite 468
Seattle, Washington 98104
(206) 858-6983

reasonably concerned about the effects pollutant discharges from Electron's facility are having on the water quality and aquatic species and wildlife that they observe, study, use, or enjoy. CHB's members are also concerned about the effects of discharges from Electron's facility on human health.

9.      Puget Soundkeeper Alliance has standing for the relief sought herein. PSA brings this complaint on behalf of itself and its member(s). PSA is a non-profit corporation organized under Section 501(c)(3) of the Internal Revenue Code and the laws of the State of Washington. PSA's principal place of business is in Seattle, Washington. PSA is dedicated to protecting and enhancing the waters of Puget Sound for the health and restoration of aquatic ecosystems and the communities that depend on them. PSA has for years been actively engaged in a variety of educational and advocacy efforts to improve water quality and to address sources of water quality degradation in the waters of western Washington, including the Puyallup River, Commencement Bay, and Puget Sound. PSA has taken legal action against more than 170 alleged CWA violators; engaged over 18,000 volunteers in cleanups, outreach events, and advocacy; and removed more than 145,000 pounds of marine debris from the waterways around Puget Sound. PSA's work covers not only the marine waters of Puget Sound, but also its freshwater tributaries including the Puyallup River.

10.      PSA has representational standing to bring this action.  PSA is a membership organization with members who are injured by Electron's violations of the CWA. PSA has at least one member who lives, works, recreates, observes, or enjoys surface waters, fish, or wildlife, within the watersheds impacted by Electron's Facility and activities, including the Puyallup River, Commencement Bay and South Puget Sound.  One or more of PSA's members are reasonably concerned about the effects pollutant discharges from Electron's facility are

COMPLAINT - 4
W.D. Wash. Case No. 2:21-cv-319

Kampmeier & Knutsen PLLC
811 First Avenue, Suite 468
Seattle, Washington 98104
(206) 858-6983

having on the water quality and aquatic species and wildlife that they observe, study, use, or enjoy. PSA's members are also concerned about the effects of discharges from Electron's facility on human health.

11.     The environmental, recreational, scientific, economic, aesthetic, cultural, spiritual, and/or health interests of the Conservation Groups and its members have been, are being, and will be adversely affected by Electron's discharges of pollutants and violations of the CWA. Discharges from Electron's facility, and violations of the CWA at Electron's facility, adversely impact the Conservation Groups' and their members' aesthetic, recreational, scientific, spiritual, and other interests in the Puyallup River, Commencement Bay, and Puget Sound by impairing or threatening to impair those waters and the species that rely on those waters. The Conservation Groups' members' uses of the impacted watersheds are thereby adversely affected and also suppressed. These injuries are fairly traceable to Electron's dam and activities and the relief sought in this lawsuit can redress these injuries to the Conservation Groups' and their members' interests.

12.     The Conservation Groups also have organizational standing to bring this action. Both Conservation Groups have been actively engaged in a variety of educational and advocacy efforts to improve water quality and to address sources of water quality degradation in the waters of western Washington, including the Puyallup River, Commencement Bay and South Puget Sound. As alleged herein and in the Notice Letter, Electron has discharged various materials and taken actions without first obtaining the required permits or authorizations. Those permits and authorizations likely would have required important monitoring, record keeping, inspection, and reporting requirements. As a result, the Conservation Groups have been deprived of information necessary to properly serve its members by providing information and taking appropriate action

Kampmeier & Knutsen PLLC
811 First Avenue, Suite 468
Seattle, Washington 98104
(206) 858-6983

to advance its mission. The Conservation Groups' efforts to educate and advocate for greater

environmental protection, and to ensure the success of environmental restoration projects

implemented for the benefit of its members, are also frustrated. Finally, the Conservation Groups

and the public have been deprived of information that influences members of the public to

become members of PSA or CHB, thereby potentially reducing those groups' membership

numbers. Thus, the Conservation Groups' organizational interests have been adversely affected

by Electron's violations. These injuries are fairly traceable to Electron's violations and are

redressable by the Court.

13.     Electron Hydro, LLC is a corporation authorized to conduct business under the

laws of the State of Washington. Electron owns and operates a hydroelectric dam facility at or

near 29711 Kapowsin-Electron Reservoir Road, Orting, Washington 98360, between Puyallup

River miles 41.3 and 31, including a diversion structure, fish ladder, flume, settling basin,

forebay or reservoir, penstocks, powerhouse, and other related facilities (hereinafter "the

Facility"). Defendant and its Facility discharge pollutants and dredged or fill material to the

Puyallup River, which is tributary to Puget Sound.

## IV.     LEGAL BACKGROUND.

14.     Congress enacted the Clean Water Act to "restore and maintain the chemical,

physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a).

15.     As relevant here, Section 301(a) of the CWA, 33 U.S.C. § 1311(a), prohibits the

discharge of pollutants by any person unless such discharge is authorized by a National Pollutant

Discharge Elimination System ("NPDES") permit issued pursuant to section 402 of the Act or, if

the discharge is of dredged or fill material, a permit issued pursuant to section 404 of the Act

("Section 404 Permit"). *See* 33 U.S.C. §§ 1311(a), 1342, 1344.

COMPLAINT - 6
W.D. Wash. Case No. 2:21-cv-319

Kampmeier & Knutsen PLLC
811 First Avenue, Suite 468
Seattle, Washington 98104
(206) 858-6983

16.     The Act defines the term "discharge of a pollutant" to mean, in part, "any addition of any pollutant to navigable waters from any point source . . . ." 33 U.S.C. § 1362(12).

17.     The Act defines the term "point source" to mean, in part, "any discernible, confined and discrete conveyance, including but not limited to any pipe, ditch, channel, tunnel, conduit, well, discrete fissure, container, rolling stock, concentrated animal feeding operation, or vessel or other floating craft, from which pollutants are or may be discharged." 33 U.S.C. § 1362(14).

18.     The Act defines the term "pollutant" to mean, in part, "dredged spoil, solid waste, incinerator residue, sewage, garbage, sewage sludge, munitions, chemical wastes, biological materials, radioactive materials, heat, wrecked or discarded equipment, rock, sand, cellar dirt and industrial, municipal, and agricultural waste discharged into water." 33 U.S.C. § 1362(6).

19.     The Act's prohibition on discharging pollutants from point sources applies broadly. The Act defines the term "navigable waters" to mean "the waters of the United States, including the territorial seas." 33 U.S.C. § 1362(7). And the Act defines the term "person" to mean "an individual, corporation, partnership, association, State, municipality, commission, or political subdivision of a State, or any interstate body." 33 U.S.C. § 1362(5).

20.     Section 404 of the Act authorizes the U.S. Army Corps of Engineers ("the Corps") to issue Section 404 Permits authorizing discharges of dredged or fill materials to waters of the United States. *See* 33 U.S.C. § 1344. As part of this program, the Corps issues nationwide permits that authorize discharges of dredged or fill material associated with certain common activities, including dam maintenance and stream bank stabilization. The Corps announced reissuance of its nationwide permits in January 2017. *See* 82 Fed. Reg. 1860. After the

publication of the final nationwide permits, the Corps' Seattle district imposed regional

conditions that apply to activities covered by nationwide permits conducted within that district.

21.     Section 401 of the Act, 33 U.S.C. § 1341, requires any applicant for a federal

license or permit to conduct any activity, including but not limited to the construction or

operation of facilities that may result in any discharge into the navigable waters, to provide the

permitting agency with a certification from the State in which the discharge originates that any

such discharge will comply with the applicable provisions of sections 301, 302, 303, 306, and

307 of the CWA. On March 6, 2017, Ecology issued 401 Certifications for the Corps'

nationwide permits 3 and 13. Ecology's 401 Certifications apply to and limit activities and

discharges authorized by the Corps' nationwide permits, including nationwide permits 3 and 13.

22.     Ecology's 401 Certification conditions require dischargers to apply for and obtain

a site-specific 401 Certification from Ecology under certain conditions, including: if the project

would cause, or may be likely to cause or contribute to, an exceedance of a state water quality

standard or sediment management standard; if the project or activity will occur in a CWA section

303(d) listed segment of a waterbody or upstream of a listed segment and may result in further

exceedances of the specific listed parameter; if the project or activities are below the ordinary

high water mark with new work being proposed outside the original footprint; for any project or

activity with temporary fill in waters of the state for more than 90 days, unless the applicant has

received written approval from Ecology; or if the project or activity includes adding a new

structure to the site.

23.     For projects requiring a site-specific 401 Certification from Ecology, applicants

must apply to Ecology and provide: (a) a description of the project, including site plans, project

purpose, direct and indirect adverse environmental effects the project would cause, best

COMPLAINT - 8
W.D. Wash. Case No. 2:21-cv-319

Kampmeier & Knutsen PLLC
811 First Avenue, Suite 468
Seattle, Washington 98104
(206) 858-6983

management practices, and any other Department of the Army or federal agency permits used or

intended to be used to authorize any part of the proposed project or any related activity; (b)

drawings indicating the Ordinary High Water Mark, delineation of special aquatic sites and other

waters of the state, including wetlands; (c) a statement describing how the mitigation

requirement will be satisfied, including an explanation of how the applicant has followed the

mitigation sequence and have first avoided and minimized impacts to aquatic resources wherever

practicable; (d) information demonstrating compliance with other applicable requirements of the

Corps' Nationwide Permit General Condition 32, the Corps' Regional Conditions, or notification

conditions of the applicable nationwide permit.

24. Ecology's March 6, 2017 401 Certification for the Corps' nationwide permits 3

and 13 also requires all projects that involve land disturbance to obtain and implement all

required permits.

25. Discharging pollutants without the required permits, or in violation of a 401

Certification, constitutes a violation of the Clean Water Act and is grounds for a citizen

enforcement action. 33 U.S.C. §§ 1365(a)(1), (f).

## V. FACTS.

A. <u>Electron Discharged Artificial Field Turf and Plastic Liner to the Puyallup River.</u>

26. Electron's Facility includes a wooden flow diversion structure, a spillway, a water

intake, a 10-mile long flume that conveys diverted water to a forebay, penstocks, and a

powerhouse for electricity generation.

27. Electron planned and proposed the Electron Hydro Diversion Repair and Spillway

Replacement Project ("the Project"), which includes construction to repair the wooden diversion

structure, replace the spillway, and reinforce existing shoreline protection infrastructure at the

Facility.

28.     In 2016 or 2017, Electron applied to the Corps for Section 404 Permits to authorize discharges of dredged or fill material associated with Electron's proposed work to repair the diversion structure, reinforce the shoreline protection, and construct an inflatable bladder spillway.

29.     The Corps issued Electron Section 404 Permits for that work on August 8, 2018. The Corps authorized Electron's work pursuant to Nationwide Permit 3 and Nationwide Permit 13, subject to certain special conditions.

30.     Electron completed the upstream shoreline protection work at the Facility during the summer of 2018. Electron completed the downstream shoreline protection work at the Facility during the summer of 2019.

31.     In the summer of 2020 Electron began construction of the bladder spillway. In the summer of 2020, Electron constructed a temporary bypass channel to divert Puyallup River flow around the expected in-water work area at the diversion spillway site.

32.     Between July 20 and July 27, 2020, Electron dewatered the bypass channel for construction work and placed approximately 2,409 square yards of artificial field turf into the bypass channel, along with the plastic liner, to keep the channel dry and to facilitate its construction activities. The artificial field turf was waste from another facility.

33.     Electron did not inform the Corps before it used field turf and plastic liner in the bypass channel at its Facility. Electron's use of the field turf was not authorized by any CWA permit for the Project.

34.     Electron diverted Puyallup River flow into the bypass channel on or about July 28, 2020.

COMPLAINT - 10
W.D. Wash. Case No. 2:21-cv-319

Kampmeier & Knutsen PLLC
811 First Avenue, Suite 468
Seattle, Washington 98104
(206) 858-6983

35.     On or around July 29 or July 30, 2020, the Puyallup River broke the artificial field turf and plastic liner loose and sent approximately 617 square yards of field turf and pieces of plastic liner, and at least four to six cubic yards of rubber turf crumb, down the Puyallup River. After those materials broke loose, approximately 1,792 square yards of plastic liner and field turf remained in place in the bypass channel.

36.     Electron did not notify regulators of the discharges of artificial field turf, plastic liner, and rubber crumb until August 4, 2020.

B.     <u>After Discharging Field Turf and Plastic Liner to the Puyallup River, Electron Performed In-Water Construction and Maintenance Work That Was Not Authorized by Permits or the CWA.</u>

37.     On August 5, 2020, Pierce County issued a stop work order and imposed conditions on Electron. On August 7, 2020, the Corps issued a stop work order, explained that the deposit of the field turf was not authorized by the existing permits for the Project, and demanded additional information from Electron. The Corps specifically noted that "the in water work is being done without the proper installation of best management practices such as a temporary berm and cofferdam."

38.     By letter dated September 11, 2020, Pierce County requested that Electron complete a list of work to stabilize the site, to minimize potential effects to water quality and fish species within the Puyallup River, and to regain fish passage at the project site. The work requested in Pierce County's September 11, 2020 letter required extensive work in the river channel, including removal of partially buried concrete culverts placed vertically and filled with rubble located in bladder dam foundation area and being used at the time as a coffer structure; securing the wooden diversion structure; placing heavy rounded rip-rap at the outlet of the fish ladder; removing Conex boxes from the river channel; removing all artificial turf and plastic

COMPLAINT - 11
W.D. Wash. Case No. 2:21-cv-319

Kampmeier & Knutsen PLLC
811 First Avenue, Suite 468
Seattle, Washington 98104
(206) 858-6983

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28
29

liner from the bypass channel; placing super-sacks at the top of the channel to redirect river flow; and removing concrete culverts, debris, and other construction related materials from the active river channel. Most or all of that work was not authorized by Electron's CWA permits for the Project. The County's September 11, 2020 letter noted this, requiring Electron "to prepare a new plan for permits that outlines a responsible construction sequence" that all permitting agencies needed to approve, and to initiate consultation under the federal Endangered Species Act.

39.     By letter dated September 12, 2020, the Corps authorized implementation of the work listed in Pierce County's September 11, 2020 letter to Electron. The Corps' September 12, 2020 letter states: "Although we are authorizing the implementation of the activities described in the Pierce County letter dated September 11, 2020, it is important to note this letter is not a permit."

40.     By letter dated September 28, 2020, Electron sought an extension of the in-water work period through October 28, 2020. Electron's September 28, 2020 letter listed a series of projects requiring work in the Puyallup River, including work to maintain proper pool step heights at the fish ladder; maintaining an effective cofferdam barrier to separate work areas from open river flow; construction of a concrete abutment wall; construction of a temporary rock fill diversion and spillway fill that Electron expected would remain in place until the summer of 2021; construction of cofferdams in the Puyallup River; construction of fish ladder facilities and pool steps; fish protection measures during transfer; restoring river gravel bar surfaces to prevent stranding; and the use of heavy machinery in the Puyallup River during construction and maintenance activities.

Kampmeier & Knutsen PLLC
811 First Avenue, Suite 468
Seattle, Washington 98104
(206) 858-6983

41.     By letter dated September 30, 2020, the Corps approved Electron's request for an extension of the in-water work period through October 28, 2020. In doing so, the Corps again stated, "it is important to note this letter is not a permit."

42.     After July 30, 2020, Electron constructed a concrete abutment wall in the Puyallup River at the Facility. Electron's construction of a concrete abutment wall in the Puyallup River at the Facility resulted in or constituted the discharge of dredged or fill material to waters of the United States.

43.     After July 30, 2020, Electron constructed a rock diversion structure in the Puyallup River. Electron's construction of a rock diversion structure in the Puyallup River at the Facility resulted in or constituted the discharge of dredged or fill material to waters of the United States. After July 30, 2020, Electron discharged new fill material at the Facility's diversion structure in the Puyallup River. Electron's discharge of new fill material at the Facility's diversion structure in the Puyallup River resulted in or constituted the discharge of dredged or fill material to waters of the United States.

44.     After July 30, 2020, Electron constructed temporary or permanent cofferdams at the Facility in the Puyallup River. Electron's construction of temporary or permanent cofferdams in the Puyallup River at the Facility resulted in or constituted the discharge of dredged or fill material to waters of the United States.

45.     After July 30, 2020, Electron used heavy machinery during construction and maintenance work at the Facility in the Puyallup River, including when Electron worked on the fish ladder at the Facility and when it removed partially buried concrete culverts placed in the proposed bladder dam foundation area at the Facility. These activities resulted in or constituted the discharge of dredged or fill materials to waters of the United States.

Kampmeier & Knutsen PLLC
811 First Avenue, Suite 468
Seattle, Washington 98104
(206) 858-6983

46.     After July 30, 2020, Electron placed large rocks in the Puyallup River at the fish ladder at the Facility. Electron's placement of large rocks in the Puyallup River at the fish ladder at the Facility resulted in or constituted the discharge of dredged or fill materials to waters of the United States.

47.     After July 30, 2020, Electron removed Conex boxes from the Puyallup River. Electron's removal of Conex boxes from the Puyallup River resulted in or constituted the discharge of dredged or fill materials to waters of the United States. On information and belief, after July 30, 2020, Electron discharged new fill material near the Facility's diversion structure in the Puyallup River. Electron's discharge of new fill material near the Facility's diversion structure in the Puyallup River resulted in or constituted the discharge of dredged or fill material to waters of the United States.

48.     After July 30, 2020, Electron used heavy machinery to remove artificial field turf and plastic liner from the bypass channel in the Puyallup River. Electron's use of heavy machinery to remove artificial field turf and plastic liner from the bypass channel in the Puyallup River resulted in or constituted the discharge of dredged or fill materials to waters of the United States.

49.     On information and belief, after July 30, 2020, Electron placed super-sacks in the Puyallup River to redirect river flow. Electron's placement of super-sacks in the Puyallup River to redirect river flow resulted in or constituted the discharge of dredged or fill materials to waters of the United States.

50.     After July 30, 2020, Electron removed concrete culverts, debris, and other construction materials from the Puyallup River. Electron's removal or concrete culverts, debris, and other construction materials from the Puyallup River resulted in or constituted the discharge

of dredged or fill materials to waters of the United States.

51.     None of Electron's discharges of dredged or fill materials to waters of the United States that occurred at the Facility after July 30, 2020 pursuant to Pierce County's September 11, 2020 letter was authorized by a Section 404 Permit. Those discharges violated and are in violation of the CWA and are ongoing. Additionally, there is a reasonable likelihood that Electron will again discharge pollutants or dredged or fill material in violation of the CWA because Electron still has in-river work to do to complete the Project.

C.     <u>Electron Violated and Is Violating Section 401 of the CWA by Failing to Implement Its Permits and by Failing to Apply for and Obtain a Site-Specific 401 Certification.</u>

52.     Electron's construction work and other activities in the Puyallup River after July 30, 2020 violate the terms and conditions of the 401 Certifications applicable to nationwide permits 3 and 13 because Electron failed to implement and violated its CWA permits for the Project.

53.     Electron is in violation of the 401 Certifications applicable to nationwide permits 3 and 13 because Electron did not apply for and obtain a site-specific 401 Certification from Ecology for any of its operations or activities that occurred at the Facility after July 30, 2020.

54.     Electron was required to apply for and obtain a site-specific 401 Certification for in-water work occurring after July 30, 2020 because, as designed or implemented, it was likely to cause or contribute to an exceedance of a state water quality standard or sediment management standard because that work, especially the excavation of riverbed materials for use as fill and the construction and maintenance work that occurred after September 15, 2020 (outside the work window), eliminated fish habitat or prevented fish from using those portions of the river channel, in violation of Washington's water quality standards.

Kampmeier & Knutsen PLLC
811 First Avenue, Suite 468
Seattle, Washington 98104
(206) 858-6983

55.     Electron was required to apply for and obtain a site-specific 401 Certification because, as designed or implemented, Electron's construction work at the Facility after July 30, 2020 added temporary fill to waters of the United States that will remain in the river for more than 90 days without written approval from Ecology, including the concrete abutment wall, the temporary rock dam and rock-core diversion and spillway, the temporary and permanent cofferdams, the heavy rounded rip-rap at the outlet of the fish ladder, and the placement of super-sacks at the top of the channel to redirect river flow.

56.     Electron was required to apply for and obtain a site-specific 401 Certification because, as designed or implemented, Electron's construction work at the Facility since July 30, 2020 is below the ordinary high-water mark and, because Electron is widening and deepening the diversion structures at the Facility, that work includes new work occurring outside the original footprint of the Facility.

57.     Electron was required to apply for and obtain a site-specific 401 Certification because, as designed or implemented, Electron's construction work at the Facility since July 30, 2020 added new structures to the site, including a new concrete abutment wall, new temporary rock dam and rock-core diversion and spillway, new temporary and permanent cofferdams, new heavy rounded rip-rap at the outlet of the fish ladder, and new super-sacks at the top of the channel to redirect river flow.

D.      <u>Electron Has Violated and Is Violating Section 301(a) of the CWA by Discharging Heat and Other Pollutants to the Puyallup River Without CWA Authorization.</u>

58.     Electron uses a flume to move water from the Puyallup River to and through a settling basin and forebay before penstocks route the water to and through the powerhouse and then to the Puyallup River. This process adds heat to the water that Electron runs through the

penstocks and powerhouse to generate electricity. Electron adds heat to the water used at the Facility by running that water through penstocks, which warm the water as it descends through the penstocks to the powerhouse at the Facility. On information and belief, Electron also adds heat to the water used at the Facility by running that water through a flume and holding it in a forebay.

59.     Electron discharges heat to the Puyallup River every day it runs water through the penstocks at the Facility. Electron discharges heat to the Puyallup River every day it runs water through the powerhouse at the Facility. Electron discharges heat to the Puyallup River every day it generates electricity at the Facility.

60.     Heat is a pollutant.

61.     Electron discharges heat to the Puyallup River from point sources at the Facility. The flume at the Facility is a point source. The flume at the Facility is a conveyance. The flume at the Facility is a pipe. The penstocks at the Facility are point sources. The penstocks at the Facility are conveyances. The penstocks at the Facility are pipes. The powerhouse at the Facility is a point source. The tailrace at the Facility is a point source. The tailrace at the Facility is a conveyance.

62.     Electron periodically removes sediments from the forebay at the Facility. Electron's removal of sediments from the forebay at the Facility results in the discharge of sediment from the Facility to the Puyallup River. Electron periodically removes solids from the forebay at the Facility. Electron's removal of solids from the forebay at the Facility results in the discharge of solids from the Facility to the Puyallup River.

63.     Sediment is a pollutant. Solids are a pollutant.

Kampmeier & Knutsen PLLC
811 First Avenue, Suite 468
Seattle, Washington 98104
(206) 858-6983

64.     On July 29, 2020, Electron dumped dead and dying fish and warm water into the Puyallup River from trucks, buckets, and conveyances that are point sources. Dead fish are a pollutant. Dying fish are a pollutant.

65.     Electron's discharges of heat, sediment, solids, and dead and dying fish to the Puyallup River violate Section 301(a) of the CWA, 33 U.S.C. § 1311(a), because Electron has no NPDES or Section 404 Permit authorizing them. These violations are ongoing or reasonably likely to recur because Defendant will continue operating the Facility.

## VI.     CAUSES OF ACTION.

66.     Defendant Electron Hydro, LLC is a "person" within the meaning of Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a), and is subject to suit under the Act's citizen suit provision, 33 U.S.C. § 1365.

67.     Upon information and belief, all the CWA violations committed by Electron are ongoing and continuing or are reasonably likely to continue to occur. Any and all additional violations of the CWA that occur after the date of the Conservation Groups' Notice Letter, but before a final decision in this action, are continuing violations subject to this complaint.

68.     Without the imposition of appropriate civil penalties and the issuance of declaratory relief and an injunction, Electron is likely to continue to violate Sections 301(a) and 401 of the CWA to the further injury of the Conservation Groups, their members, and the public.

FIRST CLAIM FOR RELIEF
(Violations of 33 U.S.C. § 1341)
(Violations of a 401 Certification)

69.     Plaintiffs hereby reallege and incorporate by reference the preceding paragraphs and relevant allegations in the Notice Letter.

Kampmeier & Knutsen PLLC
811 First Avenue, Suite 468
Seattle, Washington 98104
(206) 858-6983

70.     Defendant Electron Hydro, LLC has violated and is violating Section 401 of the Clean Water Act, 33 U.S.C. § 1341, and an "effluent standard or limitation" as that term is defined by Section 505 of the Act, 33 U.S.C. § 1365, by violating the CWA permits applicable to the Project in violation of the 401 Certification applicable to nationwide permits 3 and 13.

71.     Defendant Electron Hydro, LLC has violated and is violating Section 401 of the Clean Water Act, 33 U.S.C. § 1341, and an "effluent standard or limitation" as that term is defined by Section 505 of the Act, 33 U.S.C. § 1365, by failing to apply for and obtain a site-specific section 401 Certification for Electron's work on the Project.

72.     These violations have occurred each and every day since July 30, 2020. These violations are ongoing, are described in the Notice Letter, and are hereby incorporated by reference as if fully set forth herein. *See* Exhibit 1.

SECOND CLAIM FOR RELIEF
(Violations of 33 U.S.C. § 1311(a))
(Unauthorized Discharges of Dredged or Fill Material)

73.     Plaintiffs hereby reallege and incorporate by reference the preceding paragraphs and relevant allegations in the Notice Letter.

74.     Defendant Electron Hydro, LLC has violated and is violating Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a), and an "effluent standard or limitation" as that term is defined by Section 505 of the Act, 33 U.S.C. § 1365, by discharging pollutants or dredged or fill material to the Puyallup River and Puget Sound without CWA authorization, including by building a rock diversion structure, concrete abutment wall, and cofferdams in the Puyallup River; by placing fill at the diversion structure at the Facility; by placing rip-rap at the fish ladder at the Facility; by placing super-sacks in the Puyallup River to redirect river flow; and by performing construction and maintenance activities in the Puyallup River at the Facility. These

Kampmeier & Knutsen PLLC
811 First Avenue, Suite 468
Seattle, Washington 98104
(206) 858-6983

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28
29

violations have occurred each and every day since July 30, 2020. These violations are ongoing, are described in the Notice Letter, and are hereby incorporated by reference as if fully set forth herein. *See* Exhibit 1.

THIRD CLAIM FOR RELIEF
(Violations of 33 U.S.C. § 1311(a))
(Unauthorized Discharges of Heat)

75.     Plaintiffs hereby reallege and incorporate by reference the preceding paragraphs and relevant allegations in the Notice Letter.

76.     Defendant Electron Hydro, LLC has violated and is violating Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a), and an "effluent standard or limitation" as that term is defined by Section 505 of the Act, 33 U.S.C. § 1365, by discharging heat to the Puyallup River and Puget Sound without authorization of an NPDES permit. These violations have occurred each and every day since March 9, 2016 that the Facility added water to the Puyallup River. Defendant possesses the information necessary to identify the specific dates these alleged violations occurred. These violations are ongoing, are described in the Notice Letter, and are hereby incorporated by reference as if fully set forth herein. *See* Exhibit 1.

FOURTH CLAIM FOR RELIEF
(Violations of 33 U.S.C. § 1311(a))
(Unauthorized Discharges of Sediments, Solids, and Other Pollutants)

77.     Plaintiffs hereby reallege and incorporate by reference the preceding paragraphs and relevant allegations in the Notice Letter.

78.     Defendant Electron Hydro, LLC has violated and is violating Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a), and an "effluent standard or limitation" as that term is defined by Section 505 of the Act, 33 U.S.C. § 1365, by discharging sediments, solids, and dead and dying fish to the Puyallup River and Puget Sound without CWA authorization. These

Kampmeier & Knutsen PLLC
811 First Avenue, Suite 468
Seattle, Washington 98104
(206) 858-6983

violations have occurred each and every day since March 9, 2016 that the Facility removed sediments or solids from the forebay and/or disposed of fish from the Facility. Defendant possesses the information necessary to identify the specific dates these alleged violations occurred. These violations are ongoing, are described in the Notice Letter, and are hereby incorporated by reference as if fully set forth herein. *See* Exhibit 1.

## VII.   RELIEF REQUESTED.

Wherefore, the Conservation Groups respectfully requests that this Court grant the following relief:

A.      Issue a declaratory judgment that Electron has violated and continues to be in violation of Section 401 of the CWA, 33 U.S.C. § 1341, and 401 Certification issued thereunder;

B.      Enjoin Electron from conducting activities or operating the Facility in a manner that violates Section 401 of the CWA, 33 U.S.C. § 1341, or a 401 Certification issued thereunder;

C.      Issue a declaratory judgment that Electron has violated and continues to be in violation of Section 301(a) of the CWA, 33 U.S.C. §1311(a);

D.      Enjoin Electron from discharging pollutants in violation of Section 301(a) of the CWA, 33 U.S.C. § 1311(a);

E.      Order Electron to provide the Conservation Groups, for a period beginning on the date of the Court's Order and running for one year after Electron achieves compliance with Sections 301(a) and 401 of the CWA, with copies of all reports and other documents that Electron submits to or receives from Ecology, the Corps, or EPA regarding Electron's Facility at the same time those documents are submitted to or received from Ecology, the Corps, or EPA;

Kampmeier & Knutsen PLLC
811 First Avenue, Suite 468
Seattle, Washington 98104
(206) 858-6983

F.      Order Electron to take specific actions to remediate the environmental harm caused by any of its violations of the CWA;

G.      Grant such other preliminary and/or permanent injunctive relief as the Conservation Groups may request during the pendency of this case;

H.      Order Electron to pay civil penalties pursuant to sections 309(d), and 505(a) of the CWA, 33 U.S.C. §§ 1319(d), 1365(a), and 40 C.F.R. § 19;

I.      Award the Conservation Groups their litigation expenses, including reasonable attorneys' and expert witness fees, as authorized by Section 505 of the CWA, 33 U.S.C. § 1365, and/or as otherwise authorized by law; and

J.      Award such other relief as this Court deems appropriate.

RESPECTFULLY SUBMITTED this 9th day of March 2021.

KAMPMEIER & KNUTSEN PLLC

s/  Paul Kampmeier
Paul Kampmeier, WSBA No. 31560
811 First Avenue, Suite 468
Seattle, Washington 98104
Phone: (206) 858-6983
Email: paul@kampmeierknutsen.com

*Attorney for Plaintiffs Citizens for a Healthy Bay
and Puget Soundkeeper Alliance*

s/  Katelyn Kinn
Katelyn Kinn, WSBA No. 42686
Puget Soundkeeper Alliance
130 Nickerson Street, Suite 107
Seattle, Washington 98109
Phone: (206) 297-7002
Email: katelyn@pugetsoundkeeper.org

*Attorney for Plaintiff Puget Soundkeeper Alliance*

COMPLAINT - 22
W.D. Wash. Case No. 2:21-cv-319

Kampmeier & Knutsen PLLC
811 First Avenue, Suite 468
Seattle, Washington 98104
(206) 858-6983

# Exhibit 1

# KAMPMEIER & KNUTSEN PLLC

## ATTORNEYS AT LAW

PAUL A. KAMPMEIER
Licensed in Washington
206.858.6983
paul@kampmeierknutsen.com

October 28, 2020

*Via Certified Mail – Return Receipt Requested*

Managing Agent
Electron Hydro, LLC
1800 James Street, Suite 201
Bellingham, Washington 98225-4631

Managing Agent
Electron Hydro, LLC
29711 Kapowsin-Electron Reservoir Road
Orting, Washington 98360

Managing Agent
Electron Holdings, Inc.
1800 James Street, Suite 201
Bellingham, Washington 98225

Managing Agent
Electron Management LLC
1800 James Street, Suite 201
Bellingham, Washington 98225-4631

Managing Agent
Tollhouse Energy Company
1800 James Street, Suite 201
Bellingham, Washington 98225

> **Re:    Notice of Intent to File Suit under the Clean Water Act and the Resource Conservation and Recovery Act and Request for SWPPP and Site Log Book.**

Dear Managing Agents:

This letter provides Electron Hydro, LLC, Electron Holdings, Inc., Electron Management LLC, and Tollhouse Energy Company (hereinafter referred to collectively as "Electron") with sixty days' notice of Citizens for a Healthy Bay's and Puget Soundkeeper Alliance's intent to file a citizen lawsuit against Electron under Section 505 of the Clean Water Act, 33 U.S.C. §1365, for the Clean Water Act

("CWA") violations alleged and described in this letter. This letter also notifies Electron that after the required notice period Citizens for a Healthy Bay and Puget Soundkeeper Alliance (the "Conservation Groups") intend to sue Electron under 42 U.S.C. § 6972 for alleged violations of the Resource Conservation and Recovery Act ("RCRA"). The Conservation Groups are non-profit organizations dedicated to protecting the natural environment of Puget Sound and its tributaries. Kampmeier & Knutsen, PLLC represent Citizens for a Healthy Bay and Puget Soundkeeper Alliance in this matter, and any response to this notice of intent to sue should be directed to Paul Kampmeier at Kampmeier & Knutsen PLLC at the address below.

This notice letter pertains to the Electron dam and related operations located at 29711 Kapowsin-Electron Reservoir Road, Orting, Washington 98360, and between Puyallup River miles 41.3 and 31, including the diversion structure, fish ladder, flume, settling basin, forebay or reservoir, penstocks, powerhouse, and all other related facilities (hereinafter "the Facility"). As set forth below, Electron has violated and continues to violate the CWA by: (1) violating the terms and conditions of Electron's Construction Stormwater General National Pollutant Discharge Elimination System Permit; (2) conducting activities and discharging pollutants, stormwater associated with industrial activity, and/or dredged or fill material in violation of the terms and conditions of the CWA section 401 certification applicable to construction and maintenance activities at the Facility; (3) conducting activities and discharging pollutants, stormwater associated with industrial activity, and/or dredged or fill material without a valid and applicable CWA section 401 certification from the Washington State Department of Ecology; and (4) discharging pollutants, stormwater associated with industrial activity, and/or dredged or fill material to the Puyallup River and Puget Sound without the required National Pollutant Discharge Elimination System ("NPDES") and CWA section 404 permits. The Conservation Groups also allege Electron is violating the imminent and substantial endangerment and open dumping provisions of RCRA.

The CWA and RCRA violations alleged and described in this notice of intent to sue are ongoing or reasonably likely to recur. Unless Electron promptly resolves the violations alleged herein to the Conservation Groups' satisfaction, the Conservation Groups will file a citizen lawsuit against Electron in U.S. District Court immediately following the expiration of the notice periods that commence with this notice letter. The Conservation Groups intend to seek declaratory relief, injunctive relief, and civil penalties of up to $55,800 per day for each CWA violation, as well as similar relief under RCRA. And the Conservation Groups intend to sue for all violations, including those discovered after the date of this notice letter and those occurring after the Conservation Groups file a complaint in court. If Electron has any information showing that one or more of the violations outlined in this notice did not occur, please provide that information to the Conservation Groups immediately, specifying the violation(s) in question.

## I.    BACKGROUND.

A.    <u>The Clean Water Act.</u>

Congress enacted the Clean Water Act in 1972 to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). In doing so, Congress declared a national goal of eliminating discharges of pollutants to navigable waters by 1985. Section 301(a) of the CWA—the heart of the statute—prohibits the discharge of pollutants except, *inter alia*, in accordance

with the terms of an NPDES permit issued pursuant to CWA section 402, 33 U.S.C. § 1342, or a Section 404 permit issued pursuant to CWA section 404, 33 U.S.C. § 1344. *See* 33 U.S.C. 1311(a).

The State of Washington implements a NPDES permit program administered by the Washington State Department of Ecology ("Ecology"). Ecology periodically issues a general NPDES permit authorizing discharges of stormwater associated with construction activity, a type of industrial activity subject to the NPDES permit requirements, in Washington. For facilities that obtain coverage under it, Ecology's current Washington Construction Stormwater General Permit authorizes discharges of industrial stormwater, provided the discharges are in compliance with the terms and conditions of the permit. Any other direct or indirect discharge to waters of the state is prohibited, and any noncompliance with an NPDES permit constitutes a violation of the CWA and is grounds for an enforcement action.

The U.S. Army Corps of Engineers ("the Corps") implements a CWA section 404 permit program and issues Section 404 permits authorizing discharges of dredged or fill materials to waters of the United States. As part of this program, the Corps issues nationwide permits that authorize discharges of dredged or fill material associated with certain common activities, including dam maintenance and stream bank stabilization. The Corps announced reissuance of its nationwide permits in January 2017. *See* 82 Fed. Reg. 1860. After the publication of the final nationwide permits, the Corps' Seattle district revised and finalized regional conditions that apply to activities covered by nationwide permits conducted within that district. On March 6, 2017, Ecology issued a set of CWA section 401 certifications for the Corps' nationwide permits. The terms and conditions of the Corps' nationwide permits, regional conditions, and Ecology's 401 certifications apply to and limit activities and discharges of dredged or fill material authorized by a nationwide permit. Any other direct or indirect discharge to waters of the state is prohibited, and any noncompliance with a Section 404 permit or related CWA section 401 certification constitutes a violation of the Clean Water Act and is grounds for an enforcement action.

B.     Electron and Its Operations at the Facility.

Electron owns and operates a hydroelectric dam and related facilities on the Puyallup River in Washington State. The dam and related facilities include a diversion structure, project intake, and fish ladder at approximately river mile 41.3 of the Puyallup River; a flume, settling basin, forebay or reservoir, and penstocks between the diversion structure and the powerhouse; and turbines and a powerhouse that discharge to the Puyallup River at approximately river mile 31.

In 2016 or 2017, Electron applied to the Corps for permits to repair the diversion, reinforce the shoreline protection, and construct an inflatable bladder spillway. Electron received permits for the work on August 8, 2018. Electron completed the upstream shoreline protection during the summer of 2018; completed the downstream shoreline protection in the summer of 2019; and in the summer of 2020 began construction of the bladder spillway. Electron obtained coverage under the Corps' nationwide permits 3 and 13 because the work included or resulted in discharges of dredged or fill material to waters of the United States. Additionally, Electron obtained coverage under Washington's Construction Stormwater General NPDES Permit.

In the summer of 2020, Electron constructed a temporary bypass channel to divert Puyallup River flow around the expected in-water work area at the diversion spillway site. Between July 20 and

- 3 -

July 27, 2020, Electron dewatered the bypass channel for construction work. Groundwater was moving up into the river channel, so Electron laid down a plastic liner to keep the channel dry. Concerned that the plastic liner would fail, Electron then placed approximately 2,409 square yards of artificial field turf into the de-watered channel to act as an "underlayment" for the plastic liner. Electron then diverted the river flow into the bypass channel on July 28, 2020. Subsequently, on or around July 29 and 30, 2020, river flow broke the artificial turf and liner loose, sending approximately 617 square yards of turf and pieces of plastic liner, and at least four to six cubic yards of rubber turf crumb, down the river. Upstream of the ruptured liner area, approximately 1,792 square yards of liner and field turf underlayment remained in place and intact. Additionally, operations at the dam caused a large fish kill on July 29, 2020, during which Electron disposed of dead and dying fish by dumping them into the Puyallup River. Electron also added warm water to the Puyallup River during fish release operations on July 29, 2020.

Electron did not notify regulators of the discharges of artificial field turf, plastic liner, and rubber crumb until August 4, 2020. On August 5, 2020, Pierce County issued a stop work order and imposed conditions on Electron. On August 7, 2020, the Corps issued a stop work order, explained that the deposit of the field turf was not authorized by the existing permits for the project, and demanded additional information from Electron. The Corps specifically noted:

> In response to a complaint, my staff recently reviewed work performed on your property located in the Puyallup River near Electron, Pierce County, Washington. This evaluation also included reviewing the information provided by Mr. Chris Spens on August 4, 2020. This information and review revealed the following deviations from the approved plans: the installation and subsequent discharge of astro-turf within the Puyallup River was not authorized by the above reference project, and the in water work is being done without the proper installation of best management practices such as a temporary berm and cofferdam.

> Our letter transmitting your permit stated that any change in plans found necessary must be submitted to this office for approval before construction. You did not submit revised plans as required under your permit.

The Corps then identified several other permit violations by Electron.

By letter dated September 11, 2020, Pierce County lifted its stop work order to allow a specific list of work to stabilize the site and minimize potential effects to water quality and fish species within the Puyallup River, and to regain fish passage at the project site. The work requested by the County required extensive work in the river channel, including removal of partially buried concrete culverts placed vertically and filled with rubble located in bladder dam foundation area and presently being used as a coffer structure; securing the wooden diversion structure; placing heavy rounded rip-rap at the outlet of the fish ladder; removing Conex boxes from the river channel; removal of all artificial turf and HDPE liner from the bypass channel; placement of super-sacks at the top of the channel to redirect river flow; and removal of concrete culverts, debris, and other construction related materials from the active river channel. That work is not authorized by existing permits for the project; indeed, Pierce County noted in its September 11, 2020 letter that: "Electron Hydro will be required to prepare a new plan for permits that outlines a responsible construction sequence and meets approval of all agencies. After approval, Electron Hydro will be required to follow the plan and notify the permitting agencies of any

- 4 -

and all departures. The plans shall be submitted to the county along with new permit applications. Electron Hydro must initiate consultation for Endangered Species Act coverage and comply with all environmental laws and regulations." By letter dated September 12, 2020, the Corps authorized implementation of the work required by Pierce County, but expressly stated: "Although we are authorizing the implementation of the activities described in the Pierce County letter dated September 11, 2020, it is important to note this letter is not a permit."

By letter dated September 28, 2020, Electron sought an extension of the in-water work period through October 28, 2020. In doing so, Electron noted: "The previously approved scope of work provides for maintenance of the fish ladder and construction of the center concrete abutment wall." Electron then listed a series of projects that will require in-channel work, including work to maintain proper pool step heights at the fish ladder; maintaining an effective cofferdam barrier to separate work areas from open river flow; completing construction of a concrete abutment wall to attach to the dam diversion structure; constructing a rock-core diversion and spillway fill; "decommissioning of the work site including switching flows back to the left bank, fish protection mechanisms during transfer, emptying and removing steel cofferdam containers, [and] removal and clean-up of the bypass chute and all synthetic materials that may remain; and "restoring river gravel bar surfaces to prevent stranding." This work will include construction of a temporary rock fill diversion spillway that will remain in place until the summer of 2021 when work will resume to complete the project as originally permitted. In addition to all of that in-channel work, Electron will also be adding temporary or permanent cofferdams and crossing the river channel with heavy machinery during construction activities and for maintenance and construction of the fish ladder and pool steps.

As to the fish ladder, "Electron proposes to use rock boulders up to 3-5 [feet] in diameter carefully placed below the fish ladder in semi-circular 'steps' to create additional pools to lower the transition height between the river level and the entrance to the lowest ladder cell. The larger boulders will require utilizing heavy equipment that will need to enter the river and transport rock up to 60 [feet] across the river then place each rock while the equipment is stationed in the river." Additionally, "[t]he upstream ladder entrance may be periodically manipulated with river rock placed slightly upstream of the entrance as necessary to help manage flow volume and velocity. … The ladder will thereafter be maintained by a smaller excavator located on the east bank (right bank) near the fish ladder. Occasionally it is expected that an excavator may be required to traverse the river to remove rocks and debris from the fish ladder entrances to maintain fish accessability."

By letter dated September 30, 2020, the Corps approved Electron's request for an extension of the in-water work period through October 28, 2020. In doing so, the Corps again stated, "it is important to note this letter is not a permit."

## II.  ALLEGED VIOLATIONS OF THE CLEAN WATER ACT.

A.  Electron Is Violating Washington's Construction Stormwater General Permit.

Electron has violated and is violating the CWA by discharging pollutants, stormwater associated with industrial activity, and/or dredged or fill material from its Facility in violation of the terms and conditions of its Construction Stormwater NPDES permit. Electron is in ongoing violation of an "effluent standard or limitation" under the CWA. *See* 33 U.S.C. §§ 1365(a)(1), (f).

Ecology issued the current iteration of the Washington Construction Stormwater General Permit on November 18, 2015, with an effective date of January 1, 2016 and an expiration date of December 31, 2020, and modified the permit effective May 5, 2017. Electron was granted coverage under that permit effective July 5, 2018 and assigned permit number WAR306648 (the "Construction Permit"), with a disturbed area authorization of 4.5 acres. Ecology granted a modification of Electron's Construction Permit effective September 18, 2020 that increased the disturbed area authorization to 10 acres. Electron's Construction Permit regulates discharges of stormwater associated with construction activities undertaken to modify, repair, and/or replace diversion, spillway, and/or other structures associated with the Electron Hydropower Project.

Electron has violated and continues to violate the terms and conditions of the Construction Permit with respect to operations and activities at the areas subject to Electron's Construction Permit and discharges of stormwater and other pollutants from such areas.

      *1.      Violations of Water Quality Standards.*

Condition S3.A of the Construction Permit prohibits discharges that cause or contribute to a violation of a water quality standard. Water quality standards are the foundation of the CWA's and Washington's efforts to protect clean water. Water quality standards represent the U.S. Environmental Protection Agency's ("EPA") and Ecology's determination, based on scientific studies, of the thresholds at which pollution starts to cause significant adverse impacts on fish and other beneficial uses.

A discharger must comply with both narrative and numeric criteria and protect designated uses. WAC 173-201A-010; *see also* WAC 173-201A-510 ("No waste discharge permit can be issued that causes or contributes to a violation of water quality criteria . . . ."). Narrative water quality standards provide legal mandates that supplement the numeric standards. Furthermore, narrative water quality standards apply with equal force, even when Ecology has established numeric water quality standards. These standards provide, *inter alia*: that toxic or deleterious material concentrations must be below those that have the potential to adversely affect characteristic water uses, cause acute or chronic conditions in the most sensitive biota, or adversely affect public health; and that aesthetic values must not be impaired by the presence of materials or their effects, excluding those of natural origin, which offend the senses of sight, smell, touch, or taste. WAC 173-201A-260(2).

Electron discharges stormwater associated with construction activity and other pollutants to the Puyallup River at locations with a designated use of core summer habitat. The key identifying characteristics of this use are summer (June 15 - September 15) salmonid spawning or emergence, or adult holding; use as important summer rearing habitat by one or more salmonids; or foraging by adult and subadult native char. Other common characteristic aquatic life uses for waters in this category include spawning outside of the summer season, rearing, and migration by salmonids. WAC 173-201A-200(1)(a)(iii).

Commencing on or around July 20, 2020, Electron placed artificial field turf material, plastic liner, and rubber crumb into a bypass channel constructed for the intake project. On or around July 28, 2020, river flow was diverted into the bypass channel, causing the field turf material, plastic liner, and rubber crumb to degrade and discharge downriver in the Puyallup River. Artificial turf contains plastic

and rubber tire crumb. Rubber tire crumbs are toxic to fish, and will be nearly impossible to remove from the riverbed, meaning they may continue to release toxins into the river unless they can be physically removed. These discharges of field turf material, plastic liner, and rubber crumb violate water quality standards, including the criteria and designated uses identified above, and so they also violate the Construction Permit. These violations have occurred each and every day since July 28, 2020.

2.     *Failure to apply applicable standards.*

Condition S3.B of the Construction Permit provides that, prior to the discharge of stormwater and non-stormwater, Electron must apply all known, available, and reasonable methods of prevention, control, and treatment ("AKART"), including the preparation and implementation of an adequate stormwater pollution prevention plan ("SWPPP") with appropriate best management practices ("BMPs") that are installed and maintained in accordance with the SWPPP and the Construction Permit. Electron has violated and continues to violate this condition by failing to apply AKART to its discharges of stormwater and other pollutants, including the field turf material, plastic liner, and rubber crumb, and by failing to implement an adequate SWPPP and BMPs during construction and maintenance activities, including but not limited to the in-channel construction work that has occurred at the Facility since January 1, 2020. These violations have occurred each and every day since July 5, 2018.

3.     *Failure to maintain site logbook.*

Condition S4.A of the Construction Permit requires that Electron maintain a site log book that contains a record of the implementation of the SWPPP and other permit requirements, including the installation and maintenance of BMPs, site inspections, and stormwater monitoring. Electron is in violation of this condition by failing to maintain a complete and accurate site log book that includes all required information. These violations have occurred each and every day since July 5, 2018.

4.     *Violations of inspection requirements.*

Condition S4.B of the Construction Permit requires that Electron perform site inspections of all areas disturbed by construction activities, all BMPs, and all stormwater discharge points under Electron's control. Stormwater must be visually examined for the presence of suspended sediment, turbidity, discoloration, and oil sheen and the effectiveness of BMPs must be evaluated. Inspections must occur at least once each calendar week and within 24 hours of any discharge from the site except that inactive sites that are stabilized may be inspected once every calendar month.

Any problems identified through an inspection must be corrected by: reviewing the SWPPP for compliance with Condition S9 and making appropriate revisions within 7 days of the inspection; implementing and maintaining appropriate source control and/or treatment BMPs as soon as possible, addressing the problem no later than 10 days from the inspection; and documenting BMP implementation and maintenance in the site log book.

Inspections are to be conducted by a Certified Erosion and Sediment Control Lead ("CESCL"). The CESCL must have skills to assess the site conditions and construction activities that could impact the quality of the stormwater and the effectiveness of erosion and sediment control measures used to

control the quality of stormwater discharges. The CESCL must be identified in the SWPPP and present on site or on-call at all times.

The results of each inspection must be summarized in an inspection report or checklist and the report or checklist must be entered into or attached to the site log. At a minimum, the report or checklist must include: the inspection date and time; weather information, the general conditions during inspection and the approximate amount of precipitation since the last inspection, and precipitation within the last 24 hours; a summary or list of all implemented BMPs, including observations of all erosion/sediment control structures or practices; a description of the locations of the BMPs inspected, the BMPs that need maintenance and why, the BMPs that failed to operate as designed or intended; and where additional or different BMPs are needed, and why; a description of stormwater discharged from the site, noting the presence of suspended sediment, turbidity, discoloration, and oil sheen; any water quality monitoring performed during inspection; general comments, including a brief description of any BMP repairs, maintenance or installations made following the inspection; a summary report and a schedule of implementation of the remedial actions that Electron plans to take when the site inspection indicates that the site is out of compliance; the name, title, and signature of the person conducting the site inspection, a phone number or other reliable method to reach this person, and a certification as to accuracy and completeness of the report.

Electron is in violation of these inspection requirements of Condition S4.B of the Construction Permit because, since July 5, 2018, it has failed to conduct each requisite inspection in accordance with permit requirements, failed to prepare and maintain the required inspection report or checklists, failed to make the required certifications, failed to take the required corrective actions in response to problems, and failed to have a qualified CESCL identified in the SWPPP and present at the site or on-call at all times. These violations have occurred each and every day since July 5, 2018.

   5.   *Violations of discharge monitoring and reporting requirements.*

Condition S4.C of the Construction Permit requires that Electron monitor its stormwater discharges for turbidity or transparency. Electron is required to collect samples of all discharge points from the site and points where stormwater enters surface waters on site weekly and analyze the samples for turbidity/transparency levels.

Condition S4.D of the Construction Permit requires Electron to monitor stormwater for pH once poured concrete, recycled concrete, or engineered soils are first exposed to precipitation. Electron must monitor stormwater weekly in the sediment trap/pond or other locations that receive stormwater from areas of significant concrete work or engineered soils before the stormwater is discharged to surface waters.

Condition S5.B of the Construction Permit requires that Electron submit the results of discharge monitoring to Ecology monthly within 15 days following each month. Condition S4.C.2.e requires that Electron include a brief explanation in the DMR whenever it is unable to sample during a monitoring period.

Electron violated these requirements by failing to monitor and report discharges weekly for turbidity/transparency and pH, and by failing to include a brief explanation of why it was unable to

sample, every week from August 1, 2018 through July, 23, 2020, and every week from August 1, 2020 through September 30, 2020.

6.    *Violations of correction action requirements.*

Condition S4.C.5 of the Construction Permit requires Electron to take certain corrective actions whenever turbidity/transparency results reach specified benchmarks. If turbidity exceeds 25 NTU but is less than 250 NTU (i.e., if turbidity is 26 NTU to 249 NTU) or if transparency is below 33 cm but greater than 6 cm (i.e., if transparency is 32 cm to 7 cm), Electron must: review its SWPPP for compliance with Condition S9 of the Construction Permit and make appropriate revisions within 7 days of the date the discharge triggered the correction action; immediately begin the process of implementing and maintaining appropriate source control and/or treatment BMPs and address the problem within 10 days of the date the discharge triggered the correction action; and document BMP implementation and maintenance in the site log book.

If turbidity is 250 or greater or if transparency is 6 cm or less, Electron must: telephone or submit a report to the applicable Ecology regional office through the Environmental Report Tracking System ("ERTS") in accordance with Condition S5.A of the Construction Permit; review its SWPPP for compliance with Condition S9 of the Construction Permit and make appropriate revisions within 7 days of the date the discharge triggered the correction action; immediately begin the process of implementing and maintaining appropriate source control and/or treatment BMPs and address the problem within 10 days of the date the discharge triggered the correction action; document BMP implementation and maintenance in the site log book; and sample the discharges daily until turbidity is 25 NTU or less or transparency is 33 cm or greater or until it is demonstrated that discharges are complying with the applicable water quality standard for turbidity.

Electron has reported the following turbidity/transparency results:

| Monitoring Period / Sample Date | Transparency Result |
| --- | --- |
| July 18, 2020 | 7.2 cm |
| July 24, 2020 | 4.2 cm |
| July 31, 2020 | 1.2 cm |

Electron has violated the corrective action requirements of Condition S4.C.5 of the Construction Permit identified above for each of these transparency results, including the requirements to review and revise the SWPPP, implement and maintain appropriate BMPs, and document BMP implementation and maintenance in the site log. Additionally, for the July 24 and 31, 2020 sampling results, Electron violated the requirements to submit a report to Ecology through ERTS in accordance with Condition S5.A and to sample the discharges daily until certain results are achieved.

7.    *Violations of the SWPPP requirements.*

Condition S9 of the Construction Permit requires that Electron prepare and properly implement an adequate SWPPP from initial soil disturbance through final stabilization. Condition S9.B.2 requires that Electron modify the SWPPP whenever there is a change in design, construction, operation, or maintenance at the site that has, or could have, a significant effect on discharges. Upon information and

belief, including the extensive violations of the CWA and the Construction Permit documented in publicly available records, Electron has violated these requirements by failing to develop, implement, and modify a SWPPP that meets permit requirements. These violations have occurred each and every day since July 5, 2018 or initial soil disturbance, whichever occurred later.

Electron's SWPPP does not comply with Condition S9.A of the Construction Permit because it does not meet the following objectives: implement BMPs to prevent erosion and sedimentation, and to identify, reduce, eliminate or prevent stormwater contamination and water pollution from construction activity; prevent violations of surface water quality, ground water quality, or sediment management standards; and control peak volumetric flow rates and velocities of stormwater discharges.

The SWPPP does not meet the general requirements of Condition S9.B because it does not include a narrative and drawings that include all required information. BMPs are not clearly referenced in the narrative and marked on the drawings and the narrative does not include documentation to explain and justify the pollution prevention decisions made for the project. The documentation does not include: information about existing site conditions (topography, drainage, soils, vegetation, etc.); potential erosion problem areas; the 13 elements of a SWPPP in Special Condition S9.D.1-13, including BMPs used to address each element; construction phasing/sequence and general BMP implementation schedule; the actions to be taken if BMP performance goals are not achieved; and engineering calculations for ponds, treatment systems, and any other designed structures.

The SWPPP fails to satisfy the requirements of Condition S9.C of the Construction Permit because it does not describe BMPs that are consistent with applicable stormwater technical manuals or document how BMPs included in the SWPPP provide an equivalent level of pollution prevention (including the technical basis for selection of BMPs and assessment of how the BMPs satisfy AKART).

The SWPPP does not comply with the narrative content and requirements provisions of Condition S9.D of the Construction Permit because it does not include the required 13 elements or clearly justify why an element is exempted.

The SWPPP does not meet the narrative requirements of Condition S9.D.1 of the Construction Permit because it does not include adequate BMPs to preserve vegetation and mark clearing limits; it does not require Electron to clearly mark all clearing limits, sensitive areas and their buffers, and trees that are to be preserved within the construction area or to retain the duff layer, native topsoil, and natural vegetation in an undisturbed state to the maximum degree practicable.

The SWPPP does not meet the narrative requirements of Condition S9.D.2 of the Construction Permit because it lacks adequate BMPs to establish construction access. The SWPPP fails to include BMPs to: limit construction vehicle access and exit to one route, if possible; stabilize access points with a pad of quarry spalls, crushed rock, or other equivalent BMPs, to minimize tracking sediment onto roads; locate wheel wash or tire baths on site, if the stabilized construction entrance is not effective in preventing tracking sediment onto roads; if sediment is tracked off site, clean the affected roadway thoroughly at the end of each day, or more frequently as necessary (for example, during wet weather) and remove sediment from roads by shoveling, sweeping, or pickup and transport of the sediment to a controlled sediment disposal area; and conduct street washing only after sediment removal in accordance with Special Condition S9.D.2.d.

- 10 -

The SWPPP fails to comply with the narrative requirements of Condition S9.D.3 of the Construction Permit because it lacks appropriate BMPS that control flow rates. The SWPP does not include BMPs that: protect properties and waterways downstream of the site from erosion and the associated discharge of turbid waters due to increases in the velocity and peak volumetric flow rate of stormwater runoff from the project site; construct stormwater retention or detention facilities as one of the first steps in grading and that assure that detention facilities function properly before constructing site improvements (for example, impervious surfaces); if permanent infiltration ponds are used for flow control during construction, protect these facilities from siltation during the construction phase.

The SWPPP does not meet the narrative requirements of Condition S9.D.4 of the Construction Permit because it lacks BMPs for the adequate design, installation, and maintenance of effective erosion and sediment controls. The SWPP does not include controls to: construct sediment control BMPs (sediment ponds, traps, filters, infiltration facilities, etc.) as one of the first steps in grading; minimize sediment discharges from the site in a manner that addresses factors such as the amount, frequency, intensity and duration of precipitation, the nature of resulting stormwater runoff, and soil characteristics, including the range of soil particle sizes expected to be present on the site; direct stormwater runoff from disturbed areas through a sediment pond or other appropriate sediment removal BMP, before the runoff leaves a construction site or before discharge to an infiltration facility; locate BMPs intended to trap sediment on site in a manner to avoid interference with the movement of juvenile salmonids attempting to enter off-channel areas or drainages; provide and maintain natural buffers around surface waters, direct stormwater to vegetated areas to increase sediment removal and maximize stormwater infiltration, unless infeasible; and where feasible, design outlet structures that withdraw impounded stormwater from the surface to avoid discharging sediment that is still suspended lower in the water column.

Electron's SWPPP does not meet the narrative requirements of Condition S9.D.5 of the Construction Permit because it does not include adequate measures to stabilize soils. The SWPPP does not include BMPs that require Electron: stabilize exposed and unworked soils by application of effective BMPs that prevent erosion; control stormwater volume and velocity within the site to minimize soil erosion; control stormwater discharges, including both peak flow rates and total stormwater volume, to minimize erosion at outlets and to minimize downstream channel and stream bank erosion; prevent soils from remaining exposed and unworked for more than specified time periods to prevent erosion; stabilize soils at the end of the shift before a holiday or weekend if needed based on the weather forecast; stabilize soil stockpiles from erosion, protected with sediment trapping measures, and where possible, be located away from storm drain inlets, waterways, and drainage channels; minimize the amount of soil exposed during construction activity; minimize the disturbance of steep slopes; and minimize soil compaction and, unless infeasible, preserve topsoil.

The SWPPP does not meet the narrative requirements of Condition S9.D.6 of the Construction Permit because it lacks required measures to protect slopes. The SWPPP lacks BMPs that require Electron to: design and construct cut-and-fill slopes in a manner to minimize erosion; divert off-site stormwater (run-on) or ground water away from slopes and disturbed areas with interceptor dikes, pipes, and/or swales; at the top of slopes, collect drainage in pipe slope drains or protected channels to prevent erosion; place excavated material on the uphill side of trenches, consistent with safety and space considerations; and place check dams at regular intervals within constructed channels that are cut down a slope.

Electron's SWPPP fails to meet narrative requirements of Condition S9.D.7 of the Construction Permit for the protection of drain inlets because it lacks BMPs to protect all storm drain inlets made operable during construction so that stormwater runoff does not enter the conveyance system without first being filtered or treated to remove sediment and to clean or remove and replace inlet protection devices when sediment has filled one-third of the available storage (unless a different standard is specified by the product manufacturer).

The SWPPP does not comply with the narrative requirements of Condition S9.D.8 of the Construction Permit because it does not include required measures to stabilize channels and outlets; it does not require Electron to design, construct and stabilize all on-site conveyance channels to prevent erosion from expected peak flows; and it does not require the stabilization adequate to prevent erosion of outlets, adjacent stream banks, slopes, and downstream reaches at the outlets of all conveyance systems.

Electron's SWPPP does not meet the narrative requirements of Condition S9.D.9 of the Construction Permit because it does not include BMPs to design, install, implement and maintain effective pollution prevention measures to minimize the discharge of pollutants. The SWPPP does not require Electron to: handle and dispose of all pollutants, including waste materials and demolition debris in a manner that does not cause contamination of stormwater; provide cover, containment, and protection from vandalism for all chemicals, liquid products, petroleum products, and other materials that have the potential to pose a threat to human health or the environment; provide secondary containment for on-site fueling tanks; conduct maintenance, fueling, and repair of heavy equipment and vehicles using spill prevention and control measures; clean contaminated surfaces immediately following any spill incident; discharge wheel wash or tire bath wastewater to a separate on-site treatment system that prevents discharge to surface water, such as closed-loop recirculation or upland land application, or to the sanitary sewer with local sewer district approval; apply fertilizers and pesticides in a manner and at application rates that will not result in loss of chemical to stormwater runoff; use BMPs to prevent contamination of stormwater runoff by pH-modifying sources; adjust the pH of stormwater or authorized non-stormwater if necessary to prevent an exceedance of groundwater and/or surface water quality standards; assure that washout of concrete trucks is performed off-site or in designated concrete washout areas only; obtain written approval from Ecology before using any chemical treatment, with the exception of $CO_2$ or dry ice used to adjust pH.

The SWPPP does not meet the narrative requirements of Condition S9.D.10 of the Construction Permit because it lacks required measures to control dewatering. The SWPPP does not require Electron to discharge foundation, vault, and trench dewatering water into a controlled conveyance system before discharge to a sediment trap or sediment pond; discharge clean, non-turbid dewatering water to systems tributary to, or directly into surface waters of the State; and handle highly turbid or contaminated dewatering water separately from stormwater.

Electron's SWPPP does not meet the narrative requirements of Condition S9.D.11 of the Construction Permit because it does not include adequate provisions for maintaining BMPs. The SWPPP does not require Electron to maintain and repair all temporary and permanent erosion and sediment control BMPs as needed to assure continued performance of their intended function in accordance with BMP specifications; and remove all temporary erosion and sediment control BMPs within 30 days after achieving final site stabilization or after the temporary BMPs are no longer needed.

The SWPPP does not meet the narrative requirements of Condition S9.D.12 of the Construction Permit because it lacks BMPs to manage the project. The SWPPP does not require Electron to: phase development projects to the maximum degree practicable and take into account seasonal work limitations; inspect, maintain and repair all BMPs as needed to assure continued performance of their intended function; conduct site inspections and monitoring in accordance with Special Condition S4; maintain, update, and implement the SWPPP in accordance with Special Conditions S3, S4 and S9.

Electron's SWPPP does not meet the narrative requirements of Condition S9.D.13 of the Construction Permit because it does not include measures to protect Low Impact Development (LID). The SWPPP does not require Electron to: protect all Bioretention and Rain Garden facilities from sedimentation; maintain the infiltration capabilities of Bioretention and Rain Garden facilities by protecting against compaction by construction equipment and foot traffic; control erosion and avoid introducing sediment from surrounding land uses onto permeable pavements; clean permeable pavements fouled with sediments or no longer passing an initial infiltration test using local stormwater manual methodology or the manufacturer's procedures; and keep all heavy equipment off existing soils under LID facilities that have been excavated to final grade to retain the infiltration rate of the soils.

Electron's SWPPP does not comply with Condition S9.E of the Construction Permit because it does not include a vicinity or general location map with enough detail to identify the location of the construction site and the receiving waters within one mile of the site. Further, the SWPPP does not include a legible site map (or maps) showing the entire construction site with the following features identified: 1) the direction of north, property lines, and existing structures and roads; 2) cut and fill slopes indicating the top and bottom of slope catch lines; 3) approximate slopes, contours, and direction of stormwater flow before and after major grading activities; 4) areas of soil disturbance and areas that will not be disturbed; 5) locations of structural and nonstructural controls (BMPs) identified in the SWPPP; 6) locations of off-site material, stockpiles, waste storage, borrow areas, and vehicle/equipment storage areas; 7) locations of all surface water bodies, including wetlands; 8) locations where stormwater or non-stormwater discharges off-site and/or to a surface waterbody, including wetlands; 9) location of water quality sampling station(s), if sampling is required by state or local permitting authority; 10) areas where final stabilization has been accomplished and no further construction-phase permit requirements apply; and 11) location or proposed location of LID facilities.

Electron has violated Condition S9 of the Construction Permit and the CWA every day since July 5, 2018, or since initial soil disturbance, by failing to maintain and implement a SWPPP that meets the requirements of the Construction Permit. These violations are ongoing.

　　8.　　*Violations of the record requirements.*

Condition S5.D of the Construction Permit requires that Electron record the following information for each discharge sample taken: the date, place, method, and time of sampling; the name of the individual who performed the sampling; the date(s) the analyses were performed; the name of the individual who performed the analyses; the analytical techniques or methods used; and the results of all analyses. Condition S5.C of the Construction Permit requires Electron retain the following records until three years following permit termination: all monitoring information (site log book, sampling results, inspection reports/checklists, etc.); the SWPPP; a copy of the permit coverage letter(s); and any other

documentation of compliance with permit requirements. Electron has violated these requirements by failing to record and retain all of the required information and materials since July 5, 2018.

       9.     *Failure to provide required notifications of noncompliance.*

Condition S5.F of the Construction Permit provides that, if Electron is unable to comply with the terms and conditions of the permit in a manner that may cause a threat to human health or the environment, Electron must: notify Ecology within 24-hours of the failure to comply; immediately take action to prevent the discharge/pollution, or otherwise stop or correct the noncompliance; and submit a detailed written report to Ecology within five days of becoming aware of the circumstances. The report must contain: a description of the noncompliance, including exact dates and times; if the noncompliance has not been corrected, the anticipated time it is expected to continue; and the steps taken or planned to reduce, eliminate, and prevent reoccurrence of the noncompliance. Electron has violated these notification and reporting requirements for the violations identified herein that may threaten human health or the environment, including those related to discharges of the field turf that violate water quality standards, the violations of the corrective action requirements of Condition S4.C.5 of the Construction Permit, the violations of discharge monitoring and reporting requirements of Conditions S4.C, S4.D, and S5.B of the Construction Permit, and the violations of the inspection requirements of Condition S4.B of the Construction Permit. These violations have occurred on each and every day since July 5, 2018.

       10.     *Failure to report planned changes.*

Condition G20 of the Construction Permit requires Electron, as soon as possible, to give notice to Ecology of planned physical alterations, modifications or additions to the permitted construction activity. Similarly, Condition G21 of the Construction Permit requires Electron, where it becomes aware that it failed to submit any relevant facts in a permit application, or submitted incorrect information in a permit application or in any report to Ecology, to promptly submit such facts or information. Electron violated these conditions each and every day since July 20, 2020 by failing to notify Ecology of the deviations from its work plans and permitted activities that have taken place at the Facility since that date.

       11.     *Request for complete SWPPP and site log book.*

Pursuant to Condition S5.G.2.b of the Construction Permit, the Conservation Groups hereby request that Electron provide copies of, or access to, Electron's SWPPP and Site Log Book, complete with all incorporated plans, reports, checklists, training logs, and inspection logs. The copies of the SWPPP, Site Log Book, and any other communications about this request should be directed to Paul Kampmeier at the address below. Should Electron fail to provide the requested complete copies of, or access to, its SWPPP and Site Log Book as required by Condition S5.G.2.b of the Construction Permit, Electron will be in violation of that condition, which violation shall also be subject to this Notice of Intent to Sue and any resulting lawsuit.

B.    <u>Electron Is Violating Ecology's Section 401 Certification for Nationwide Permits 3 and 13.</u>

Electron has violated and is violating the CWA by conducting activities and discharging pollutants, stormwater associated with industrial activity, and/or dredged or fill material from its Facility

in violation of the terms and conditions of the CWA section 401 certification applicable to the construction and maintenance operations at the Facility. Electron is in ongoing violation of an "effluent standard or limitation" under the CWA. *See* 33 U.S.C. §§ 1365(a)(1), (f).

    *1.     Failure to apply for and obtain site-specific CWA section 401 review and certification.*

On March 6, 2017, Ecology certified the Corps' nationwide permits 3 and 13 subject to specific CWA section 401 certification conditions. Ecology certified both nationwide permits 3 and 13 subject to conditions that require Electron to apply for and obtain a site-specific 401 certification from Ecology under certain conditions, including if the project will cause, or may be likely to cause or contribute to, an exceedance of a state water quality standard or sediment management standard; if the project or activity will occur in a CWA section 303(d) listed segment of a waterbody or upstream of a listed segment and may result in further exceedances of the specific listed parameter; if the project or activities are below the ordinary high water mark with new work being proposed outside the original footprint; for any project or activity with temporary fill in waters of the state for more than 90 days, unless the applicant has received written approval from Ecology; or if the project or activity includes adding a new structure to the site.

For projects requiring site-specific CWA section 401 certification from Ecology, Ecology's 401 certification for nationwide permits 3 and 13 states in part:

[A]pplicants must provide Ecology with a Joint Aquatic Resources Permit Application (JARPA) along with the documentation provided to the Corps, as described in National General Condition 32, Pre-Construction Notification, including, when applicable:

(a) A description of the project, including site plans, project purpose, direct and indirect adverse environmental effects the project would cause, best management practices (BMPs), and any other Department of the Army or federal agency permits used or intended to be used to authorize any part of the proposed project or any related activity.

(b) Drawings indicating the Ordinary High Water Mark (OHWM), delineation of special aquatic sites and other waters of the state. Wetland delineations must be prepared in accordance with the current method required by the Corps and shall include Ecology's Wetland Rating form. Wetland rating forms are subject to review and verification by Ecology staff. Guidance for determining the OHWM is available on Ecology's website.

(c) A statement describing how the mitigation requirement will be satisfied. A conceptual or detailed mitigation or restoration plan may be submitted. See State General Condition 5 for details on mitigation requirements.

(d) Other applicable requirements of Corps Nationwide Permit General Condition 32, Corps Regional Conditions, or notification conditions of the applicable NWP.

Applicants are also required to show that they have followed the mitigation sequence and have first avoided and minimized impacts to aquatic resources wherever practicable.

Electron has violated and is in violation of Ecology's March 6, 2017 CWA section 401 certification for the Corps' nationwide permits 3 and 13 because it has failed to apply for and obtain a site-specific CWA section 401 review and certification from Ecology for the construction and maintenance operations that have occurred at the Facility since June 2018 or that will occur going forward, including Electron's planned expansion of the diversion structure; the placement of plastic liner, field turf, and rubber crumb in the diversion channel; the subsequent discharge of those materials to the Puyallup River; the construction of the concrete abutment wall; the construction of a rock-core diversion and spillway fill; the construction of temporary or permanent cofferdams; the crossing of the river channel with heavy machinery during construction activities and for maintenance and construction of the fish ladder and pool steps; the removal of partially buried concrete culverts placed vertically and filled with rubble located in bladder dam foundation area and used as a coffer structure; securing the wooden diversion structure; placing heavy rounded rip-rap at the outlet of the fish ladder; removing Conex boxes from the river channel; removal of all artificial turf and HDPE liner from the bypass channel; placement of super-sacks at the top of the channel to redirect river flow; removal of concrete culverts, debris, and other construction related materials from the active river channel; and all the other diversion structure and fish ladder maintenance and replacement work that occurred in the summer and fall of 2020.

That work and Ecology's 401 certification for nationwide permits 3 and 13 required Electron to apply for and obtain a site-specific CWA section 401 review and certification from Ecology for at least the following reasons. First, as designed or implemented, it was likely to cause or contribute to an exceedance of a state water quality standard or sediment management standard because the in-water work, especially the excavation of riverbed materials for use as fill and the construction and maintenance work that occurred after September 15, 2020 (outside the work window), eliminated fish habitat or prevented fish from using those portions of the river channel, and the discharge of field turf, plastic liner, and rubber crumb violates state water quality standards and sediment standards. Second, as designed or implemented, Electron's construction work at the Facility since July 20, 2020 added temporary fill to waters of the state that will remain in the river for more than 90 days, without written approval from Ecology, including the field turf, plastic liner, rubber crumb, concrete abutment wall, temporary rock dam and rock-core diversion and spillway, temporary and permanent cofferdams, the heavy rounded rip-rap at the outlet of the fish ladder, and the placement of super-sacks at the top of the channel to redirect river flow. Third, as designed or implemented, the project or activities are below the ordinary high water mark with new work being proposed outside the original footprint because Electron is widening and deepening the diversion structures at the Facility. And fourth, as designed or implemented, Electron's construction work at the Facility since July 20, 2020 added new structures to the site, including the concrete abutment wall, new temporary rock dam and rock-core diversion and spillway, new temporary and permanent cofferdams, new heavy rounded rip-rap at the outlet of the fish ladder, and new super-sacks at the top of the channel to redirect river flow. Electron violated and is violating the CWA and Ecology's 401 certification for the Corps' nationwide permits by failing to submit the required application materials to Ecology, failing to show that it has followed the mitigation sequence and first avoided and then minimized impacts to aquatic resources wherever practicable, and failing to obtain a site-specific CWA section 401 review and certification from Ecology, as required. These violations have occurred each and every day since July 5, 2018.

    2.     *Failure to comply with stormwater management requirements.*

Ecology's March 6, 2017 CWA section 401 certification for the Corps' nationwide permits 3 and 13 requires all projects that involve land disturbance to implement stormwater pollution prevention or control measures to avoid discharge of pollutants in stormwater runoff to waters of the state. For land disturbances during construction, the applicant must obtain and implement permits, including Ecology's Construction Stormwater General Permit, where required and follow Ecology's current stormwater manual. As described in Section II.A. herein, which is hereby incorporated by reference, Electron has violated and is violating Ecology's March 6, 2017 CWA section 401 certification for the Corps' nationwide permits 3 and 13 by failing to implement adequate stormwater pollution prevention or control measures and by failing to comply with Ecology's Construction Stormwater General Permit. These violations have occurred each and every day since July 5, 2018.

C.    <u>Electron Is Violating the CWA by Failing to Have a Valid CWA Section 401 Certification.</u>

Electron has violated and is violating the CWA by failing to apply for and obtain a CWA section 401 certification from Ecology before using field turf, plastic liner, and rubber crumb as part of its dam maintenance and construction activities performed in 2020 and before undertaking construction and maintenance work at the Facility after July 20, 2020, including the work described in Pierce County's September 11, 2020 letter and the Corps' September 12, 2020 letter. *See* Section I.B., above. Electron is in ongoing violation of an "effluent standard or limitation" under the CWA. *See* 33 U.S.C. §§ 1365(a)(1), (f).

CWA section 401(a)(1), 33 U.S.C. § 1341(a)(1), requires any applicant for a federal license or permit to conduct any activity, including but not limited to the construction or operation of facilities that may result in any discharge into the navigable waters, to provide the permitting agency with a certification from the State in which the discharge originates that any such discharge will comply with the applicable provisions of sections 301, 302, 303, 306, and 307 of the CWA. Electron has violated and is violating this requirement by failing to obtain and provide to the Corps a CWA section 401 certification from Ecology stating that discharges from construction and maintenance activities occurring at the Facility since July 20, 2020, including the use of field turf, rubber crumb, and plastic liner and all other maintenance and construction work undertaken at the Facility since July 20, 2020, including the work described in Pierce County's September 11, 2020 letter to Electron and the Corps' September 12, 2020 letter to Electron, will comply with the applicable provisions of sections 301, 302, 303, 306, and 307 of the CWA. These violations have occurred every day since July 20, 2020 and are ongoing.

D.    <u>Electron Is Violating Section 301(a) of the CWA.</u>

CWA section 301(a), 33 U.S.C. § 1311(a), prohibits the discharge of pollutants except, *inter alia*, in accordance with the terms of an NPDES permit issued pursuant to CWA section 402, 33 U.S.C. § 1342, or a Section 404 permit issued pursuant to CWA section 404, 33 U.S.C. § 1344. Electron has violated and is violating Section 301(a) of the CWA, 33 U.S.C. § 1311(a), by discharging pollutants and/or dredged or fill material from the Facility to the Puyallup River and Puget Sound when those discharges are not authorized by or in compliance with an NPDES or Section 404 permit, as required.

Electron is in ongoing violation of an "effluent standard or limitation" under the CWA. *See* 33 U.S.C. §§ 1365(a)(1), (f).

     *1.     Unlawful discharges of field turf, plastic liner, and rubber crumb.*

Electron has violated and is violating Section 301(a) of the CWA, 33 U.S.C. § 1311(a), by discharging pollutants and dredged or fill material—specifically the field turf, plastic liner, and crumb rubber that Electron added to the Puyallup River starting on July 20, 2020—to the Puyallup River and Puget Sound without authorization of an NPDES or CWA section 404 permit. Electron's use of the field turf, plastic liner, and crumb rubber as temporary fill was not authorized by the Corps' nationwide permit 3 or 13 because Electron did not disclose to the permitting agencies that it was going to use and discharge field turf, plastic liner, and rubber crumb, as required, and so the Corps did not reasonably contemplate the discharge of field turf, plastic liner, and rubber crumb at the time it issued Electron coverages under nationwide permits 3 and 13. Electron's use and discharge of the field turf, plastic liner, and rubber crumb to the Puyallup River and Puget Sound are therefore unauthorized discharges in violation of CWA section 301(a). These violations have occurred each and every day since July 20, 2020.

     *2.     Unlawful discharges of pollutants and/or dredged or fill material since July 20, 2020.*

Electron has violated and is violating Section 301(a) of the CWA, 33 U.S.C. § 1311(a), by discharging pollutants and dredged or fill material in connection with the maintenance and construction activities at the Facility that Electron took after discharges of field turf, plastic liner, and rubber crumb to the Puyallup River and that it is taking pursuant to the September 11, 2020 letter from Pierce County and the September 12, 2020 letter from the Corps. As explained in Section I.B., above, by letter dated September 11, 2020, Pierce County requested Electron undertake significant in-channel work, including removal of partially buried concrete culverts placed vertically and filled with rubble located in bladder dam foundation area and presently being used as a coffer structure; securing the wooden diversion structure; placing heavy rounded rip-rap at outlet of Fish Ladder; removing Conex boxes from the river channel; removal of all artificial turf and HDPE liner from the bypass channel; placement of super-sacks at the top of the channel to direct redirect river flow; and removal of concrete culverts, debris, and other construction related materials from the active river channel. By letter dated September 12, 2020, the Corps authorized implementation of the work required by Pierce County. Subsequently, by letter dated September 28, 2020, Electron sought an extension of the in-water work period through October 28, 2020 to complete a series of projects that will require in-channel work, including work to maintain proper pool step heights at the fish ladder; maintaining an effective cofferdam barrier to separate work areas from open river flow; completing construction of a concrete abutment wall to attach to the dam diversion structure; constructing a temporary rock dam and rock-core diversion and spillway fill; "decommissioning of the work site including switching flows back to the left bank, fish protection mechanisms during transfer, emptying and removing steel cofferdam containers, [and] removal and clean-up of the bypass chute and all synthetic materials that may remain; and "restoring river gravel bar surfaces to prevent stranding." In addition to all of that in-channel work, Electron will be adding temporary or permanent cofferdams and crossing the river channel with heavy machinery during construction activities and for maintenance and construction of fish ladder and pool steps. None of this work is authorized by a CWA section 404 permit so the discharges of pollutants and dredged or fill

material that occur during or as a result of this work are unpermitted and violate CWA section 301(a). These violations have occurred every day since July 28, 2020 and are ongoing.

> 3.    *Unlawful discharges of heat and other pollutants to the Puyallup River.*

Electron has violated and is violating Section 301(a) of the CWA, 33 U.S.C. § 1311(a), by discharging heat to the Puyallup River without authorization of an NPDES permit. Electron uses a flume to move water from the Puyallup River to and through a settling basin and forebay before penstocks route the water to and through the powerhouse and then to the river. This process adds heat to the water that is run through the penstocks and powerhouse to generate electricity before being discharged to the Puyallup River. Heat is a pollutant. The flume, penstocks, powerhouse, tailrace, and other dam facilities are point sources. Electron adds heat to the Puyallup River every day on which it runs water through the penstocks and powerhouse and discharges it to the river. Electron also periodically dewaters the forebay to remove sediments and solids collected there, which process results in the discharge of suspended solids from the Facility to the river. These discharges of pollutants violate CWA section 301(a) because Electron has no NPDES permit authorizing them. These violations have occurred each and every day since October 27, 2015. Additionally, Electron violated Section 301(a) of the CWA, 33 U.S.C. § 1311(a), by dumping dead and dying fish and warm water into the Puyallup River from trucks, buckets, or other conveyances on July 29, 2020, without an NPDES permit authorizing those discharges of pollutants.

E.    <u>The Conservation Groups Intend to Sue Electron for the CWA Violations Alleged Herein.</u>

The NPDES permit, CWA section 401 certification, and CWA violations alleged and described in this notice of intent to sue are ongoing or reasonably likely to recur. At the conclusion of the 60-day notice period, Citizens for a Healthy Bay and Puget Soundkeeper Alliance intend to file a lawsuit against Electron under the citizen suit provisions of Section 505 of the CWA, 33 U.S.C. § 1365. Each of the above-described violations subjects Electron to a civil penalty of up to $55,800 per violation per day. *See* 40 C.F.R. § 19.4. In addition to civil penalties, Citizens for a Healthy Bay and Puget Soundkeeper Alliance will seek injunctive relief to prevent further violations of the CWA and such other relief as is permitted by law, including recovery of the Conservation Groups' costs, attorneys' fees, expert witness fees, and other litigation costs. *See* 33 U.S.C. §§ 1365(a) and (d).

## III.    ALLEGED VIOLATIONS OF RCRA.

A.    <u>Electron is Violating RCRA's Imminent and Substantial Endangerment Provisions.</u>

Electron's use of the field turf material and rubber crumb violates the imminent and substantial endangerment provisions of RCRA. RCRA authorizes citizens to bring suit against any person who is the:

> past or present generator, past or present transporter, or past or present owner or operator of a treatment, storage, or disposal facility, who has contributed or who is contributing to the past or present handling, storage, treatment, transportation, or disposal of any solid or hazardous waste which may present an imminent and substantial endangerment to health or the environment.

42 U.S.C. §6972(a)(1)(B).

Electron is a generator, transporter, owner, and/or operator of a treatment, storage or disposal facility that has contributed and is contributing to the past and present handling, storage, treatment, transportation, and/or disposal of solid and/or hazardous waste. Specifically, Electron used previously-disposed field turf material and rubber crumb as an underlayment in a Puyallup River bypass channel, some of which was washed down river after Electron diverted the Puyallup River into the bypass channel. The field turf material and rubber crumb constitute "solid wastes" under RCRA because they are garbage, refuse, or other discarded solid material resulting from commercial or industrial activities. *See* 42 U.S.C. § 6903(27). Electron's handling, storage, treatment, transportation, and/or disposal of those wastes violates RCRA and presents and an imminent and substantial endangerment to health and/or the environment because the field turf material and rubber crumb is or may be harmful and the rubber crumb especially may be ingested by fish or other aquatic organisms. It also violates water quality standards and the CWA's prohibition on discharging pollutants without a NPDES or Section 404 permit. The disposal of these materials in the Puyallup caused and is causing environmental harm. Electron has operated in the manner described since July 20, 2020 and it is reasonably likely to continue to do so. These violations by Electron have occurred each and every day since July 20, 2020 and are ongoing or continuing.

B.    Electron is Violating RCRA's Open Dumping Provisions.

Electron's improper removal, use, and disposal of the field turf material and rubber crumb also constitute open dumping in violation of RCRA. 42 U.S.C. § 6945(a) prohibits operation of "any solid waste management practice or disposal of solid waste which constitutes open dumping of solid waste." "Disposal" means "the discharge, deposit, injection, dumping, spilling, leaking, or placing of any solid waste … into land or on any land or water so that such solid waste or hazardous waste or any constituent thereof may enter the environment or be emitted into the air or discharged into any waters, including ground waters." 42 U.S.C. § 6903(3). EPA regulations further define solid waste management practices that constitute open dumping. *See* 40 C.F.R. §§ 257 and 258. RCRA and these regulations prohibit the use and disposal of the field turf material and crumb rubber that commenced on July 20, 2020 and continues to occur daily. These violations by Electron have occurred each and every day since July 20, 2020 and are ongoing or continuing. Electron is in violation of the open dumping provisions of the RCRA.

C.    The Conservation Groups Intend to Sue Electron for the RCRA Violations Alleged Herein.

The Conservation Groups intend, at the close of the 90-day notice period, or shortly thereafter, to file a citizen suit against Electron under 42 U.S.C. § 6972(a)(1)(B). That section of RCRA states that District Courts of the United States shall have jurisdiction to order any person who "has contributed or who is contributing to the past or present handling, storage, treatment, transportation, or disposal of any solid or hazardous waste" that presents an imminent and substantial endangerment to health or the environment to take such action as may be necessary and to apply any appropriate civil penalties under 42 U.S.C. § 6928(g).

Similarly, RCRA provides for citizen enforcement of the open dumping prohibition. 42 U.S.C. §§ 6972(a)(1)(A), 6945(a). The Conservation Groups intend, at the close of the 60-day notice period, or shortly thereafter, to file a citizen suit against Electron under 42 U.S.C. § 6972(a)(1)(A). That section of RCRA states that District Courts of the United States shall have jurisdiction to enforce the standards, conditions, requirements, and prohibitions referred to in 42 U.S.C. § 6972(a)(1)(A), which includes RCRA's open dumping prohibition, to take such action as may be necessary, and to apply any appropriate civil penalties under 42 U.S.C. § 6928(g).

Under 42 U.S.C. §§ 6928(g) and 6972(a), each of the above-described violations subjects the violator to civil penalties for each day for each violation. Also, 42 U.S.C. § 6972(e) permits prevailing parties to recover costs including attorneys' fees. The Conservation Groups intend to seek injunctive relief, declaratory relief, and the imposition of the maximum civil penalties authorized by law for Electron's RCRA violations, as well as attorneys' and experts' fees and other costs of litigation.

### IV.     PERSONS GIVING NOTICE.

The full name, address, and telephone number of the parties giving this notice are:

Citizens for a Healthy Bay
535 Dock Street, Suite 213
Tacoma, Washington 98402
(253) 383-2429

Puget Soundkeeper Alliance
130 Nickerson Street, Suite 107
Seattle, Washington 98109
(206) 297-7002

### V.     ATTORNEYS REPRESENTING THE CONSERVATION GROUPS.

The attorneys representing the Conservation Groups in this matter are:

Paul Kampmeier
Kampmeier & Knutsen, PLLC
811 First Avenue, Suite 468
Seattle, Washington 98104
Telephone: (206) 858-6983

Brian A. Knutsen
Kampmeier & Knutsen PLLC
1300 S.E. Stark Street, Suite 202
Portland, Oregon 97214
Telephone: (503) 841-6515

# VI.    CONCLUSION.

The above-described violations reflect the information currently available to Citizens for a Healthy Bay and Puget Soundkeeper Alliance; however, the Conservation Groups intend to sue for all violations, including those yet to be uncovered and those committed after the date of this notice letter. During the notice periods commenced by this letter, Citizens for a Healthy Bay and Puget Soundkeeper Alliance will be willing to discuss effective remedies for the violations described herein. If you wish to pursue settlement discussions in the absence of litigation, we suggest you initiate discussions within ten days of receiving this notice so the parties can meet and discuss effective remedies for the violations alleged herein. The Conservation Groups do not intend to delay the filing of a complaint if discussions are ongoing when the notice period ends.

Kampmeier & Knutsen PLLC                    Kampmeier & Knutsen PLLC

By: _____                    By: _s/Brain Knutsen_____
        Paul Kampmeier                             Brian Knutsen

cc:    Ms. Laura Watson, Director, Washington State Department of Ecology, P.O. Box 47600, Olympia, Washington 98504-7600

Mr. Andrew Wheeler, U.S. Environmental Protection Agency, Office of the Administrator, Mail Code 1101A, 1200 Pennsylvania Avenue, N.W., Washington, DC 20460

Mr. Chris Hladick, Region 10 Administrator, U.S. Environmental Protection Agency, 1200 Sixth Avenue, Suite 155, Seattle, WA 98101

Registered Agent for Electron Hydro, LLC: Thom A. Fischer, 1800 James Street, Suite 201 Bellingham, Washington 98225-4631

Registered Agent for Electron Holdings, Inc.: Law Offices of Gene R. Moses PS, 2200 Rimland Drive, Suite 115, Bellingham, Washington 98226-6643

Registered Agent for Electron Management LLC: Law Offices of Gene R. Moses PS, 2200 Rimland Drive, Bellingham, Washington 98226-6639

Registered Agent for Tollhouse Energy Company: Thom Fischer, 1800 James Street, Suite 201, Bellingham, Washington 98225-4631